Elizabeth Kristen (SBN 218227)
ekristen@legalaidatwork.org
Nora Cassidy (SBN 321519)
ncassidy@legalaidatwork.org
Sabina Crocette (SBN 197134)
scrocette@legalaidatwork.org
**LEGAL AID AT WORK**
180 Montgomery Street, Suite 600
San Francisco, CA 94104
Telephone:     (415) 864-8848

Aaron Kaufmann (SBN 148580)
akaufmann@kgworklaw.com
Elizabeth Gropman (SBN 294156)
egropman@kgworklaw.com
**KAUFMANN & GROPMAN LLP**
1939 Harrison St., Suite 620
Oakland, CA 94612
Telephone:     (510) 817-4380

Diana Hughes Leiden (SBN 267606)
dhleiden@winston.com
Whitney Williams (SBN 335384)
whwilliams@winston.com
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071
Telephone:     (213) 615-1700

Dana L. Cook-Milligan (SBN 301340)
dlcook@winston.com
Eric Straka (SBN 336307)
estraka@winston.com
Jacqueline Ju (SBN 352204)
jju@winston.com
**WINSTON & STRAWN LLP**
101 California Street, Suite 3500
San Francisco, CA 94111
Telephone:     (415) 591-1000

Harriet Fischer (SBN 334198)
harriet.fischer@cwlc.org
**CALIFORNIA WOMEN'S LAW
CENTER**
360 N. Pacific Coast Highway, Suite 2070
El Segundo, CA 90245
Telephone:     (323) 951-1041

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| J.D., by and through her next friend, TIFFINY BARRACO; A.D., by and through her next friend, ANNA KUSSMAUL; A.R., by and through her next friend, DANIEL RODRIGUEZ and all others similarly situated,<br><br>       Plaintiffs,<br><br>       v.<br><br>MT. DIABLO UNIFIED SCHOOL DISTRICT,<br><br>       Defendant. | Case No. _____<br><br>CIVIL RIGHTS ACTION<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I.     NATURE OF THE CASE

1.     This action seeks to remedy Defendant's longstanding and ongoing Title IX violations. Title IX of the Education Amendments of 1972 ("Title IX") was enacted to provide girls and women with a civil rights tool to combat widespread gender inequities throughout our public education system. Despite Title IX being in effect for over 51 years, enforcement actions like this one are unfortunately still necessary. Plaintiffs, along with many more girls like them who attend College Park High School ("CPHS"), have been forced to bring this Title IX case to gain equal access to and experience with sports opportunities and benefits on a par with their male CPHS counterparts.

2.     Defendant administers an athletics program at CPHS that engages in local, regional, and statewide interscholastic competition. Indeed, program participants routinely go on to compete at the intercollegiate level. Yet simply because of their gender, passionate and dedicated female CPHS athletes experience flagrantly unequal treatment, benefits, and opportunities in relation to male CPHS athletes. CPHS's female students are being denied, in some cases literally, a "level playing field" due to the discriminatory actions and inaction of Defendant.

3.     As just one example of this inequity, for decades, male athletes have enjoyed a well-groomed and secure baseball facility, conveniently located near the campus parking lot and the boys locker room. The baseball field has spacious covered dugouts with bat racks, gear storage, tables and chairs, a refrigerator and microwave, locked batting cages with a ball machine, and bullpens. Team logos and school spirit banners are displayed on walls and fences. Generous bleachers grace the outside of the diamond behind high protective fencing and a state-of-the-art backstop. Multiple storage units, toilets, and a snack shack with additional bathrooms are located alongside the field. Female softball players have nothing of the kind. Their poorly maintained softball field, located at the most remote end of the campus, looks just as it did in the 1990s, according to a parent who played on the field when she herself was a student and now sees her daughter competing on the same field. It is a far trek from the girls locker room, where lockers that are too small for athletic gear force these female athletes to lug their equipment around with them to classes all day long. The varsity softball field has a single porta-potty without running water and no working water fountain. The "dugout" is a decrepit bench with chain link fencing offering no protection from sun, wind, or foul balls. The area is so narrow that

CLASS ACTION COMPLAINT                                    CASE NO. _____

the athletes' gear does not fit in the dugout and must be left outside where it is vulnerable to theft. There are no bat racks, no storage bins, no electricity. A small bleacher for fans is located impossibly far from the parking lot and remains inaccessible to people with disabilities. The aging wooden backstop has inadequate netting and low fencing, routinely resulting in foul balls sailing without warning into dugouts, bleachers, and the neighboring tennis courts, endangering unsuspecting players and passersby. But perhaps the worst part of the indignity for female athletes at CPHS is knowing that their school does not value them as much as it values male athletes, and that they are, in essence, second-class because of their gender.

4.      Plaintiffs bring this action for relief from Defendant's violations of Plaintiffs' civil rights. These violations include discrimination on the basis of sex in violation of Title IX.

5.      On behalf of themselves and all others similarly situated, Plaintiffs seek declaratory and permanent injunctive relief enjoining Defendant from continuing to engage in unlawful sex-based discrimination, plus attorneys' fees and costs, for Defendant's violations of Plaintiffs' civil rights.

**II.      JURISDICTION AND VENUE**

6.      This Court has jurisdiction under 28 U.S.C. § 1331 and § 1343 because Plaintiffs bring this action under Title IX of the Education Amendments of 1972, 20 U.S.C § 1681 *et seq.* and its implementing regulations.

7.      The Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

8.      Venue is proper in the U.S. District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Defendant is located in this District, and the events giving rise to Plaintiffs' claims occurred in this District.

**III.      PARTIES**

9.      Plaintiff J.D., age 17, is a student in the twelfth grade at CPHS who competes on the girls varsity softball team and previously competed on the wrestling team. J.D. has played softball competitively for over 13 years. Defendant has discriminated against J.D. on the basis of her sex by denying her equal athletic opportunities, treatment, and benefits. Because J.D. is a minor, she is represented in this action by her mother and next friend, Tiffiny Barraco.

CLASS ACTION COMPLAINT                                      CASE NO. _____

10. Plaintiff A.D., age 18, is a student in the twelfth grade at CPHS who competes on the girls varsity softball team and the girls varsity volleyball team. A.D. has played softball for four years and the girls volleyball team for three years. She previously played on the girls varsity basketball team from her freshman to junior year of high school. Defendant has discriminated against A.D. on the basis of her sex by denying her equal athletic opportunities, treatment, and benefits. A.D. brings this action by her mother and next friend, Anna Kussmaul.

11. Plaintiff A.R., age 17, is a student in the eleventh grade at CPHS who competes on the girls varsity softball team and the girls varsity golf team. She is a third-year varsity letterman for golf and will be a third-year varsity letterman for softball this upcoming season. Defendant has discriminated against A.R. on the basis of her sex by denying her equal athletic opportunities, treatment, and benefits. Because A.R. is a minor, she brings this action by her father and next friend, Daniel Rodriguez.

12. Defendant Mt. Diablo Unified School District ("District") is a public school district. The District governs and operates CPHS, a public high school located in Contra Costa County, California, which receives federal funding and is therefore subject to Title IX pursuant to 20 U.S.C. § 1687.

IV. **TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**

13. Title IX is a federal civil rights law in the United States enacted in 1972 that prohibits discrimination on the basis of sex in education programs and activities. For more than 50 years, the primary goal of Title IX has been to ensure equal opportunities for women in education settings. Title IX applies to a wide range of areas, such as admissions, athletics, and employment, aiming to create an environment free from gender-based discrimination. One of the key aspects of Title IX is its impact on promoting gender equity in sports, leading to increased opportunities and resources for female athletes.

14. For athletic programs at the high school level, Title IX requires equity in two areas: (1) equal athletic treatment and benefits, and (2) equal athletic participation opportunities. The law also prohibits retaliation against individuals who raise concerns regarding Title IX compliance.

15. In 1979, the Office of Civil Rights of the Department of Health, Education, and

Welfare—the precursor to today's Department of Education and Department of Health & Human Services—issued a "Policy Interpretation" of Title IX that sets a three-part test to determine whether an institution is providing equal athletic opportunities. Every federal appellate circuit that has addressed Title IX's equal participation in athletics mandate, including the Ninth Circuit, has uniformly approved and applied this test.

16.    An institution can demonstrate compliance if it satisfies one of the following three parts:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion, which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the program.

17.    Despite the reference to "intercollegiate" athletics, the three-part test applies equally to high school sports.

18.    In determining whether equal athletic benefits and opportunities are provided to male and female athletes, the following factors are considered: the provision of equipment and supplies; scheduling of games and practice time; travel and per diem allowance; the opportunity to receive coaching and academic tutoring; the provision of locker rooms, practice, and competitive facilities; the provision of medical and training facilities and services; the provision of housing and dining facilities and services; and publicity.

19.    The implementation of Title IX in high school sports not only encourages athletic pursuits among female students but also emphasizes the importance of dismantling gender-based stereotypes, fostering a more equitable sports landscape at the high school level.

CLASS ACTION COMPLAINT                                          CASE NO. _____

1    **V.    FACTUAL ALLEGATIONS**

2         20.    CPHS is a four-year public high school matriculating approximately 1,953 students (as

3    of the 2022–2023 school year, when public data was last made available as to both enrollment and

4    athletics). There are 454 female athletes and 616 male athletes. In the 2023–2024 academic year, the

5    school offered the following girls sports:  golf, tennis, volleyball, water polo, basketball, soccer,

6    softball, track and field, and lacrosse, with flag football being added for the first time. The school

7    offers boys the following athletic offerings:  golf, tennis, volleyball, water polo, basketball, soccer,

8    track and field, and lacrosse. The school's coed sports include track and field, swimming, wrestling,

9    and tackle football, although there is only one girl out of 99 players on the tackle football team, and

10   boys outnumber girls on the wrestling team by nearly four to one.

11        **A.    Failure to Effectively Accommodate Female Students' Interests and Abilities**

12        21.    According to data that College Park reported to the California Interscholastic

13   Association ("CIF") in 2022-23, Girls represent 47% of the student body at CPHS while boys represent

14   53% of the student body. However, only 42% of the athletic participation slots at CPHS are afforded

15   to girls. Thus, there exists a 5% participation gap between female athletic participation and female

16   student enrollment, and an additional 95 female athletes are needed to meet part one of Title IX's

17   three-part test (substantial proportionality).

18        22.    Upon information and belief, Defendant does not have a history and continuing practice

19   of expanding athletic programs for girls at CPHS and therefore does not satisfy part two of Title IX's

20   three-part test for assessing a school's compliance with Title IX's mandate for equal athletic

21   participation opportunities for girls.

22        23.    CPHS added flag football for girls in the 2023–2024 school year because the CIF

23   approved it as an interscholastic sport in 2023, but despite overwhelming interest and more than 40

24   girls wanting to play competitively, the District refused to establish a junior varsity team. There are

25   33 girls on the final flag football roster, enough for more than two full teams. By contrast, there are

26   three CPHS tackle football teams—varsity, junior varsity, and freshman/sophomore—accommodating

27   98 male players.

28        24.    Similarly, the District has sponsored only two softball teams for female students at

CLASS ACTION COMPLAINT                                           CASE NO. _____

CPHS (varsity and junior varsity) for 28 girls, while it has sponsored three baseball teams for boys (varsity, junior varsity, and freshman), for 51 male participants.

25.    The District offers significantly more participation opportunities to boys than to girls and has done so for years. While the participation gap at CPHS is currently 4.7%, it was 6.8% as recently as the 2018–2019 school year, meaning that the District needed to add as many as 176 more opportunities for girls to reach proportionality with the boys.

26.    The Plaintiffs are informed and believe, and based thereon allege, that the District does not have a history and continuing practice of program expansion for female student athletes and thus fails part two of the three-part test.

27.    Finally, Plaintiffs are informed and believe, and based thereon allege, that Defendant will not establish that it has fully and effectively accommodated CPHS girls' interest in playing sports in greater numbers, thus failing part three of the three-part test.

**B.    Sex-Based Discrimination in Athletic Treatment and Benefits**

28.    Defendant failed to provide equitable athletic treatment and benefits at CPHS as to female students in comparison to male students.

29.    Defendant failed to provide an effective system for Title IX implementation and compliance.

      **1.    *Provision of Locker Rooms, Practice Facilities, and Competitive Facilities***

            **a.    *Softball and Baseball***

30.    Defendant's provision of locker rooms, practice, and competitive facilities is inequitable between female and male athletes at CPHS.

31.    The girls softball program's facilities are unequal to the boys baseball program's facilities, and when assessing girls' access to athletic facilities compared to boys' access, Defendant treats girls unequally, in violation of Title IX.

32.    The boys baseball team has a state-of-the-art field for practice and competition with a groomed infield, covered pitching mound, high fences, and a carefully-maintained grass outfield.

33.    By contrast, the girls softball fields are and have been in bad condition, uneven and often overgrown with gopher holes in the outfield that pose a danger to athletes and a hard and dusty

CLASS ACTION COMPLAINT                    CASE NO. _____

1    dirt infield. The girls varsity softball field's fence is only six feet tall and has holes in it, and its outfield

2    fence is not at regulation distance because it was previously shared by recreation leagues. CPHS does

3    not provide a softball field for the girls junior varsity softball team, so that field is not located on the

4    CPHS campus, and its grass is not maintained by CPHS. Further, the girls junior varsity softball field

5    has no outfield fence at all, and the dirt is hard-packed with granular surface, making it dangerous and

6    painful for players to slide on.

7        34.    The boys baseball field has an infield tarp to protect it from inclement weather when

8    not in use. The girls softball field has no protective tarp. Consequently, boys were able to play

9    throughout March 2023 while field conditions were so bad for softball that numerous games and

10   practices had to be cancelled or postponed.

11       35.    The boys baseball facility has dugouts over three times the size of the girls softball

12   dugouts that are enclosed with a permanent slanted wooden roof protecting male players from wind,

13   sun, rain, and foul balls. The structures are secure, allowing boys to safely store equipment in them,

14   and the structures are painted and decorated with CPHS logos and colors.

15       36.    The girls softball dugouts consist of a single dilapidated wooden bench on a narrow

16   cement base surrounded by chain link fencing. Female players have been exposed to wind, rain, sun,

17   and foul balls. This year, the District added a chain link fence with plastic slats as roofing to the dugout,

18   but that still does not protect the players from the rain, wind, and foul balls. And unlike the boys

19   baseball facility, there is no secure location to store equipment between games and practices.

20       37.    The boys baseball dugouts are equipped with spacious seating, table and chairs, bat

21   racks, hat racks, storage cubbies, electrical outlets, a refrigerator, and a microwave. The dugout is

22   large enough for team meetings, and the program also has access to a team room in a container adjacent

23   to the field. The boys also use the locked dugout to store their equipment during the school day so they

24   do not have to carry it with them.

25       38.    The girls softball dugouts are too narrow to accommodate the athletes' gear and have

26   no hat racks, bat racks, or storage, so gear must be left unsecured and out of reach outside the dugout.

27   Some varsity girls who drive to school store gear in their cars during the school day, but the parking

28   lot is unlocked, unguarded, and at the opposite end of campus. Junior varsity girls mostly do not drive

CLASS ACTION COMPLAINT                                    CASE NO. _____

and thus have nowhere to safely store their gear. Girls softball has neither a team room nor a private area for team meetings.

39.     The boys baseball team has a spacious storage locker conveniently located next to their field that houses, among other things, the team's equipment  The girls' storage container is located at a significant distance from the field and the softball team has no gator vehicle, so girls and coaches must carry heavy equipment to and from the field for all practices and games.

40.     The boys baseball program has batting cages equipped with a ball machine where the boys can practice their hitting.

41.     The girls softball program has no batting cages or pitching machine. The team was recently informed that a budget for new batting cages was approved in 2018, but as of the 2023 season, none have materialized. When asked what accounted for this inaction, the District blamed it on Covid disruptions, yet 2018 was two years before the pandemic took hold, and softball subsequently completed two seasons post-pandemic. Meanwhile, improvements costing $610,000 were approved for the barely five-year-old CPHS swimming pool in February 2022, and the work was fast-tracked and completed in just five months. Similarly, in 2023, a brand new $89,000 scoreboard was installed in the CPHS gymnasium, and the floors were redone.

42.     The boys baseball program has enclosed bullpens with turf for pitching and catching practice.

43.     The girls softball program has no bullpens.

44.     The boys baseball program has a sound system that allows them to announce each player's name, narrate the action, report the score, and otherwise engage spectators.

45.     The girls softball program has no sound system.

46.     The boys baseball field has a state-of-the-art permanent extra-tall backstop with netting. The boys baseball field also has a portable backstop available for practice in open field areas.

47.     The girls softball backstop has an aging solid wooden base that blocks viewing from behind, topped by short, segmented fencing with no netting. The lack of netting is a safety hazard, as balls can be hit or thrown into the dugout or the adjacent property's parking lot.

48.     The boys baseball program has a lighted electronic scoreboard provided by CPHS that

CLASS ACTION COMPLAINT                                          CASE NO. _____

is close to the field, while the girls softball scoreboard is smaller and located on a school building far beyond both the outfield and the auxiliary field, making it barely visible to players and spectators.

49.    The boys baseball program has spacious spectator seating in the form of multiple large bleachers on three sides of the field, close to campus parking.

50.    The girls softball program has a small set of bleachers along the third base line just feet from the dugout, causing distractions for players and coaches and safety risks for spectators. Upon information and belief, these bleachers are not accessible to disabled individuals.

51.    The boys baseball field has a well-marked homerun fence.

52.    The girls softball field has no homerun fence, and its outfield bleeds into an undifferentiated and poorly maintained multi-use area.

53.    The girls restroom in the girls locker room is quite far from the softball fields, approximately 700 feet away from the varsity and junior varsity fields. There is another girls restroom approximately 270 feet away from the fields, which the players have never had access to. The only option close to the varsity softball field is a single porta-potty for varsity girls and spectators that has no running water. There is an even smaller porta-potty next to the junior varsity field. There are no operable drinking fountains for softball players or spectators.

54.    By contrast, the boys baseball field is in close proximity to regular bathrooms in both the gym and the boys locker room. There are also five porta-potties with water next to the field and additional permanent bathrooms and a snack shack with restrooms near the outfield. Most high school-age females menstruate and therefore have an even greater need for clean, secure, lighted bathrooms with running water. Yet at CPHS, male players have multiple convenient restroom options and female softball players have almost none. Softball players have reported being late to practices and games due to having to wait in line to change or use the toilets in dirty, crowded bathrooms after school. On a recent tour of the campus, Plaintiffs discovered bathrooms somewhat nearer to the softball field that they had not previously known about. CPHS personnel were aware of these facilities but, inexplicably, kept them locked and inaccessible to female athletes.

55.    Because the softball field is far from the girls locker room and from any campus parking, softball players sometimes park in the adjacent YMCA or Community Center lots, change in

their cars, and access the field from this off-campus private property because they might otherwise be late for practice or games. This is a problem because the YMCA or Community Center can ticket or tow cars when their owners are not patronizing the facilities or close the lot entirely.

56.    The varsity softball field is often open to community groups and recreation leagues.

57.    The boys baseball facility is securely fenced and locked and is not shared or used by community groups or recreation leagues. Thus, the boys baseball team has near-exclusive use of their field, with the exception of a for-profit private feeder league that charges high fees for participants and is run by the CPHS boys varsity baseball coach.

58.    Upon information and belief, recent private donations to the boys baseball program allowed heavy equipment to be brought in August 2023 to resurface the baseball field with new dirt and fertilizer and to level, fill in, and repair holes and imperfections.

59.    The District has not paid for significant improvements to the softball fields in decades. The District allows the grass to grow long and only intermittently mows it. Minimal field improvements recently budgeted for by the School Board were approved without discussion or consultation with anyone involved in the softball program. These so-called improvements address neither the program's real needs nor the grave disparities between the boys' and girls' programs enumerated in multiple communications with the District.

**b.    *Tackle Football and Flag Football***

60.    The athletic facilities Defendants provide to male-dominated[1] tackle football and girls flag football are unequal.

61.    The tackle football program practices and plays games on a large turf stadium field.

62.    The girls flag football team has only limited access to the turf stadium field. Girls flag football practices are mostly held on the unkempt, heavily used grassy area beyond the varsity softball outfield. The field is not a regulation size and is only lined for tackle football even though tackle football only sporadically uses it, as the tackle football team practices on the stadium field. Because

---

[1] While tackle football is listed as a coed sport at CPHS, there was only one female out of 99 players on the team per the latest publicly available data from the 2022-2023 school year. *See California Interscholastic Federation*, https://www.cifstate.org/coaches-admin/census/index.

CLASS ACTION COMPLAINT                                    CASE NO. _____

the field is not properly lined, the female players do not have clearly marked end zones or sidelines and must estimate out of bounds and goal areas.

63.     Upon information and belief, at the beginning of the 2023–2024 season, girls flag football players and coaches attempted to hold practice on the turf field at times when tackle players were either in the weight room or otherwise not utilizing the field. When word reached the boys' teams that girls were on the field, boys cut their weight room workout short and came out onto the field to make it clear to the girls that were not welcome. Coaches for the girls' team were forced into uncomfortable discussions with the tackle coaches and girls were made to feel like trespassers on their home field. Currently, girls are allowed on the turf just a few hours a week, and are often confined to a narrow 20–30-yard strip with tackle teams occupying the significant remainder of the field.

64.     Practicing mostly on grass with limited and restricted access to turf puts girls at a competitive disadvantage for home or away games on turf due to lack of practice time on that playing surface.

65.     Upon information and belief, the CPHS stadium turf is due to be replaced this year at great expense, but despite girls flag football being an official and very popular CIF sport, there are no plans to include regulation field lines for flag football on the new surface, as is common at other schools, so the field can be shared with other sports. This is yet another example of Defendant implementing improvements for male-dominated sports like tackle football while girls' sports like softball have been requesting facilities improvements for a decade to no avail.

66.     Tackle football has a special team room near the stadium field equipped with power and screens where football players can watch and discuss game and instructional film and footage.

67.     Girls flag football has neither a team room nor film viewing equipment.

68.     Defendant provides up to six referees per game for tackle football despite the fact that regulations require only five for regular season games.

69.     Defendant provides just the minimum two referees per game for girls flag football despite the fact that regulations allow up to four.

**c.**     ***Locker Rooms and Team Rooms***

70.     The locker room facilities available to boys' and girls' athletic teams are unequal.

71.   The boys athletic teams have access to two separate locker rooms.  The boys locker rooms have two large shower areas, multiple storage rooms, ample floor space for team meetings, and large numbers of full-sized athletic lockers. The full-sized boys lockers are comparably larger than any of the regular lockers in the girls locker room, which are small cube lockers, and boys have more lockers overall. Aisles and benches are wider in the boys locker room than in the girls locker room.

72.   The girls locker room has one small shower area, limited storage, and small, old lockers. Girls have no full-sized athletic lockers. Because the girls lockers are so small, their sports equipment does not fit, and female athletes across various girls' teams, such as Plaintiffs, must carry their sports equipment around school during the day in heavy backpacks, in addition to their school backpacks, textbooks, school supplies, and water bottles. For softball, girls have to carry bats, helmets, and mitts/gloves all day, in addition to other equipment. For lacrosse, girls must carry sticks and pads, helmets, and shoes. For flag football, girls must carry pads, helmets, shoes, jerseys, and pants.

73.   There is no team room or area adequate for team meetings in the girls locker room. In fall 2022, access to a large storage area of the girls locker room was closed off and designated as a gender-neutral changing area for non-binary students despite the boys locker room being significantly bigger with many more under-utilized areas.

74.   Last year, when the softball coach asked CPHS administration about locker room access and supervision for female athletes after school, he was told to tell the team no one was available to open or supervise the locker rooms. Thus, the softball coach must leave his work preparing for practice to open the locker rooms every day for the female players.

75.   The male-dominated wrestling team[2] has its own private storage and team meeting room upstairs from the practice and competitive wrestling gym. In this room Plaintiffs saw recruiting posters that explicitly excluded women and demeaned and disparaged females, and little if any evidence of female wrestlers' achievements.

76.   For many years, the CPHS boys basketball team had exclusive use of a private team

[2] While wrestling is listed as a coed sport at CPHS, there were 38 males and 10 females on the team, a nearly 4:1 ratio, per the latest publicly available data from the 2022-2023 school year. *See California Interscholastic Federation*, https://www.cifstate.org/coaches-admin/census/index.

CLASS ACTION COMPLAINT                                    CASE NO. _____

room beside the gym, known as the "game club," where male basketball players held meetings, had access to individual cubbies, and stored their individual and team equipment. Girls basketball had no access to this room. In fact, no CPHS girls' sports teams had any team room until this year, when girls pushed for and were finally granted the right to share the "game club" with the boys.

### 2. *Publicity and Promotion*

77.     Based upon information and belief, girls' sports are less often publicized and promoted by Defendant.

78.     On the home page of Defendant's Athletics website, there are nine sequential photographs with captions and feature stories of athletes and teams. Seven of the nine celebrate male athletes and teams and just two feature female athletes or teams.

79.     In the fall, the CPHS cheerleaders and band only cheer and play at the male-dominated tackle football games, due to Defendant's decisions to schedule band and cheer at football athletic events. Boys baseball has multiple banners hung on high fences at their field, along with a permanent painted banner on their roofed dugout. There is a snack shack near the baseball and football field where spectators can spend money that supports the baseball and football teams.

80.     Girls softball field fences are lower, and there are few places for school or team banners. There is no snack shack for the softball program's spectators and thus no opportunity to generate income from snack sales to benefit the teams.

81.     The Principal and Vice Principals of CPHS are present during every home football game, but for the softball games, one of the Vice Principals usually just stops by the game.

### 3. *Scheduling of Games and Practice Times*

82.     Defendant provides unequal scheduling of games and practice times between female and male athletes at CPHS.

83.     Based upon the publicly available schedules of CPHS sports teams' games from August through February of the 2023–2024 school year, as shared on its website, girls' sports teams are scheduled to play approximately zero to three Friday night games, whereas boys' sports teams are scheduled to play approximately 17 games on Friday nights. Friday nights are considered a prime-time scheduling slot for athletic competition at CPHS.

84.     Tackle football home games are all scheduled on Friday nights, when greater numbers of fans attend the popular "Friday Night Lights" event. In comparison, girls flag football home games are all scheduled on Wednesday nights. Thus, football schedules favor male athletes with more prime time home game opportunities on Fridays after school.

85.     Boys basketball has eight games scheduled for Friday nights in the 2023–2024 season. By comparison, girls basketball has no Friday night games scheduled at CPHS.

**4.      *Provision of Equipment and Supplies***

86.     The provision of equipment and supplies is inequitable between female and male athletes at CPHS.

87.     For example, the girls softball program's facilities and equipment are unequal to the boys baseball program's equipment.

88.     As another example, the girls volleyball program's facilities and equipment are unequal to the boys volleyball program's facilities and equipment. For example, until just this year the boys' team had a separate room at the side of the gym available only to them.

89.     And as a further example, the players on the boys lacrosse team are provided with a school-issued helmet whereas the players on the girls lacrosse team have to provide their own protective equipment.

**5.      *Coaching***

90.     Female students at CPHS participating in athletics receive fewer opportunities to receive coaching in comparison to male student athletes.

91.     Based upon publicly-available information CPHS reported to CIF's 2022–2023 census, CPHS employed 85 male coaches, none of whom coached girls' teams. In stark contrast, CPHS employed just 28 female coaches, seven of whom coached boys' teams. None of the female coaches were on-campus coaches while seven of the male coaches were on-campus coaches. Simple calculations reveal a ratio of one coach for every seven male athletes as compared to one female coach for at least every 16 female athletes. This calculation does not take into account the number of female coaches serving male teams, so the gender disparity in opportunities to receive coaching may in fact be even greater.

92.     Based upon information and belief, in the Fall 2023 season, the varsity tackle football team had four or five paid coaching positions, the junior varsity tackle football team had three paid coaching positions, and the freshman tackle football team had two or three paid coaching positions, whereas the girls flag football program had three paid coaching positions total. Similarly, based upon information and belief, the boys baseball program had four or five paid coaching positions whereas the girls softball program had three paid assistant coaching positions.

93.     Frequent turnover of coaches in the girls volleyball and softball programs has been a problem in the past several years at CPHS, which has led to less consistent high-quality coaching for the girls' teams.

**6.      *Medical and Training Services and Facilities***

94.     Female student-athletes experience the inequitable provision of medical and training services and inequitable access to such facilities in comparison to their male counterparts.

95.     For example, the head athletic trainer is assigned to be at every home and away football game for the entire duration of the game. He is present along with students trained in sports medicine. In comparison, the softball, tennis, lacrosse, and baseball teams all have to share the head athletic trainer during their home games. The softball team only has a student present during their home games who can call the head athletic trainer if he is not occupied. The trainer and the students do not travel with the softball team to away games.

96.     The CPHS weight room is used almost exclusively by the tackle football team and the baseball team, even when they are out of season. There is no published schedule for weight room use or availability for all CPHS teams, and female athletes are not encouraged to use it. Female athletes were never even scheduled to use the weight room during their season until the 2023–2024 school year when flag football team used the weight room in the fall.

**7.      *Complaints and Retaliation***

97.     Plaintiffs attended the fall 2022 Community Day on the CPHS campus, hoping to find help completing much-needed work on the softball field. There were approximately 60 community members who attended Community Day to volunteer, in addition to Plaintiffs. CPHS Principal Kevin Honey asked Plaintiffs if the few people gathered near the field were "from" the CPHS softball team,

CLASS ACTION COMPLAINT                                          CASE NO. _____

1   which they confirmed. He admitted that there was not enough work for the approximately 60
2   volunteers in attendance, who were waiting in front of the school for assignments. But despite
3   promising Plaintiffs to send volunteers to help with the softball field work, hours went by, and
4   Principal Honey did not send a single volunteer to help Plaintiffs.

5          98.    At last spring's booster club meeting, attended by Principal Honey and other
6   administrators, Plaintiffs were referred to as "the elephant in the room" by the booster club president.
7   When Plaintiffs reiterated requests for consideration of much-needed improvements for the softball
8   program, they were met with opposition, the meeting became adversarial, and no productive
9   discussion ensued.

10          99.    In Spring 2022, after the plaintiffs had complained to the booster club about unequal
11  treatment for female athletes, a Plaintiff's son sent an application to the booster club vice president for
12  a scholarship open to all booster club members' children. Every applicant who submitted a completed
13  application received a $750 scholarship except Plaintiff's son. When Plaintiff inquired as to her son's
14  scholarship, she was at first ignored and subsequently told by the booster club vice president that her
15  son's application had never been received. He never received the scholarship.

16          100.   In June 2022, the softball team added new dirt and grass to the infield and filled holes
17  in the varsity softball field on its own, using booster funds and volunteers. Just days afterward, Pleasant
18  Hill Recreation Department advertised the field as within the "CPHS Viewing Party" area for Fourth
19  of July public fireworks. Despite all of the softball team's recent efforts to improve their field, the
20  "CPHS Viewing Party" crowd that gathered to watch the holiday fireworks display from the field left
21  behind food, garbage, and other debris that the coaches had to clean up the next day before practice.

22  **VI.    CLASS ALLEGATIONS**

23          101.   The named Plaintiffs bring this action on behalf of themselves and on behalf of a class
24  of all those similarly situated pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

25          **A.    Definition**

26          102.   Plaintiffs seek to represent a class of all present and future CPHS female students and
27  potential students who participate, seek to participate, and/or are or were deterred from participating
28  in athletics at CPHS (the "Class").

**B.     Numerosity**

103.    The Class is so numerous that joinder of all members is impractical.

104.    Plaintiffs are informed and believe, and based thereon allege, that in the 2022–2023 school year, the latest time period during which information is publicly available, there were 920 female students in grades 9–12 at CPHS and 454 female students in the athletics program.

105.    It is unknown how many additional current female students or how many additional future female students would seek to participate in interscholastic athletics if additional opportunities were available. Moreover, members of the Class who may suffer future injury are not capable of being identified at this time, as the Class includes future CPHS female athletes. Upon information and belief, accordingly, class members number in the hundreds and possibly thousands.

**C.     Common Questions of Law and Fact**

106.    Common questions of law and fact predominate, and include: (a) whether female student athletes at CPHS are receiving unequal treatment and benefits in comparison to the male student athletes and (b) whether female students at CPHS are being deprived of equal opportunities to participate in sports.

**D.     Typicality**

107.    The claims of the named Plaintiffs are typical of the claims of the class. The types of discrimination that Plaintiffs have suffered as a result of sex include: receipt of unequal treatment and benefits in CPHS's sports programs in addition to exclusion from opportunities to participate in sports programs at CPHS, and are typical of the sex discrimination that members of the class have suffered, are suffering, and, unless this Court grants relief, will continue to suffer.

108.    J.D. is a typical member of the proposed class. She is a current female student athlete at CPHS for the 2023–2024 school year who is subject to discriminatory unequal participation opportunities due to Defendant's failure to accommodate female students' athletic interests and abilities as well as provide equal treatment and benefits to female student athletes. Defendant has subjected J.D. to sex-based discrimination.

109.    A.D. is a typical member of the proposed class. She is a current female student athlete at CPHS for the 2023–2024 school year who is subject to discriminatory unequal participation

1    opportunities due to Defendant's failure to accommodate female students' athletic interests and

2    abilities as well as provide equal treatment and benefits to female student athletes. Defendant has

3    subjected A.D. to sex-based discrimination.

4         110.    A.R. is a typical member of the proposed class. She is a current female student athlete

5    at CPHS for the 2023–2024 school year who is subject to discriminatory unequal participation

6    opportunities due to Defendant's failure to accommodate female students' athletic interests and

7    abilities as well as provide equal treatment and benefits to female student athletes. Defendant has

8    subjected A.R. to sex-based discrimination.

9         **E.    Adequacy of Representation**

10        111.    The named Plaintiffs are members of the proposed class and will fairly and adequately

11   represent and protect the interests of the class. Plaintiffs intend to prosecute this action rigorously in

12   order to secure remedies for the entire class. Counsel of record for Plaintiffs are experienced in state

13   and federal civil rights litigation and class actions, including Title IX class action litigation, and are

14   adequate representatives of the class.

15        **F.    Injunctive and Declaratory Relief**

16        112.    Defendant has acted or refused to act on grounds generally applicable to the class,

17   thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole

18   under Federal Rule of Civil Procedure 23(b)(2).

19   **VII.   CLAIMS FOR RELIEF**

20        113.    An actual and immediate controversy exists between Plaintiffs and Defendant, in which

21   parties have genuine and opposing interest and their interests are direct and substantial. Plaintiffs

22   contend that Defendant violated their rights and the rights of the Class under federal anti-

23   discrimination law. Plaintiffs are informed and believe and, based thereon, allege that Defendant

24   denies these allegations. Declaratory relief is therefore necessary and appropriate.

25        114.    Plaintiffs and the class members have no plain, adequate, or complete remedy at law.

26   Unless enjoined by the Court, Defendant will continue to infringe on Plaintiffs' and class members'

27   statutory rights and will continue to inflict irreparable injury. This threat of injury to Plaintiffs and

28   class members from continuing violations requires permanent injunctive relief.

CLASS ACTION COMPLAINT                                          CASE NO. _____

**FIRST CLAIM FOR RELIEF**

**(Defendant's Unequal Provision of Treatment and Benefits in the CPHS Athletics Program in Violation of Title IX of the Education Amendments of 1972)**

115.   Plaintiffs reallege and incorporate by reference as though fully contained herein, the allegations set forth in the preceding paragraphs.

116.   Title IX provides, "No person . . . shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Therefore, all programs in the District, including the athletic programs, are subject to the requirements of Title IX. 20 U.S.C. § 1687.

117.   Title IX's implementing regulations provide: "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and the recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a).

118.   Under Title IX, schools must provide "equal treatment and benefits" to regardless of gender in their athletic programs. 44 Fed. Reg. 71,413 (1979), the Department of Education, Office of Civil Rights' 1979 Policy Interpretation ("Policy Interpretation").

119.   Equal treatment and benefits are assessed based on an overall comparison of the athletic treatment and benefits the school provides to male and female student athletes, including an analysis of the following factors, among other considerations: "The provision of equipment and supplies; Scheduling of games and practice time; Opportunity to receive coaching . . .; Assignment and compensation of coaches . . . ; Provision of locker rooms, practice and competitive facilities; Provision of medical and training facilities and services; Publicity" and a school's "failure to provide necessary funds for teams for one sex." 34 C.F.R. § 106.41(c) (2)–(10).

120.   The regulations required that sponsors of interscholastic athletics comply with the regulations within three years of their effective date, or by July 21, 1978 at the latest. The regulations further require that sponsors of interscholastic athletics take such remedial actions as are necessary to

1    overcome the effects of sex discrimination in violation of Title IX. 34 C.F.R. § 106.3(a).

2        121.    Plaintiffs are informed and believe, and based thereon allege, that Defendant has not

3    taken remedial actions and that any remedial actions that Defendant has taken in the past have been

4    insufficient to satisfy Defendant's obligations under Title IX.

5        122.    Defendant has violated Title IX and its implementing regulations by discriminating

6    against female students, including Plaintiffs, by, among other things, failing to provide female student

7    athletes from CPHS with treatment and benefits that are comparable to the treatment and benefits

8    provided to male student athletes.

9        123.    Defendant's inequitable treatment of CPHS female athletes demonstrates Defendant's

10   failure to comply with Title IX.

11       124.    As a proximate result of these unlawful acts, Plaintiffs and the Class have suffered and

12   continue to suffer irreparable injury.

13       125.    Plaintiffs and the Class are entitled to relief, including declaratory relief and injunctive

14   relief, attorneys' fees, and costs.

15                              **SECOND CLAIM FOR RELIEF**

16   **(Defendant's Unequal Provision of Participation Opportunities in the CPHS Athletic Program**

17                  **in Violation of Title IX of the Education Amendments of 1972)**

18       126.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs.

19       127.    Under Title IX, schools must equal athletic participation opportunities by gender. *See*

20   1979 Policy Interpretation.

21       128.    Compliance in the area of equivalent participation opportunities is determined by a

22   three-part test.

23       129.    The first part of the test considers: "Whether intercollegiate level participation

24   opportunities for male and female students are provided in numbers substantially proportionate to their

25   respective enrollments[.]" *Id.* at 71,418 (Section VII(C)(5)(a)(1)).

26       130.    The second part of the test considers: "Where the members of one sex have been and

27   are underrepresented among intercollegiate athletes, whether the institution can show a history and

28   continuing practice of program expansion which is demonstrably responsive to the developing interest

                                            20

1    and abilities of the members of that sex[.]" *Id.* at 71,418 (Section VII(C)(5)(a)(2)).

2         131.    The third part of the test considers: "Where the members of one sex are

3 underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice

4 of program expansion such as that cited above, whether it can be demonstrated that the interests and

5 abilities of the members of that sex have been fully and effectively accommodated by the present

6 program. *Id.* at 71,418 (Section VII(C)(5)(a)(3)).

7         132.    Although the 1979 Policy Interpretation refers to "intercollegiate" sports, Title IX is

8 applicable to all recipients of federal education funds, including high schools, and thus is applicable

9 to interscholastic high school sports as well as intercollegiate sports. 34 C.F.R. § 106.11; *Ollier v.*

10 *Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 855 (9th Cir. 2014).

11         133.    With respect to the first part of the three-part test, Plaintiffs are informed and believe,

12 and based thereon allege, that the ratio of female to male athletes at CPHS is not substantially

13 proportionate to the overall ratio of enrolled female to male students at CPHS and that the number of

14 additional girls who could play sports if there were parity is more than enough to form a viable team.

15         134.    Further, with respect to the test's second part, Defendant cannot show "a history and

16 continuing practice of program expansion which is demonstrably responsive to the developing interest

17 and abilities" of CPHS's female students. *Mansourian v. Regents of the Univ. of Calif.*, 602 F.3d 958,

18 965 (9th Cir. 2010) (citing Office for Civil Rights, Guidance: The Three-Part Test (1996)). Rather,

19 female students have historically been and continue to be underrepresented in the CPHS athletics

20 program. Defendant bears the burden on part two, an affirmative defense, and must show a history and

21 continuing practice of adding athletic opportunities for females. *See Ollier*, 768 F.3d at 857–58.

22         135.    Finally, with respect to part three, despite this underrepresentation of girls and despite

23 the interests and abilities of female students at CPHS to participate in sports in greater numbers,

24 Defendant has no history and continuing practice of program expansion responsive to female students'

25 interests. Defendant bears the burden on part three as well. *See Ollier*, 768 F.3d at 857–58.

26         136.    As a proximate result of these unlawful acts, Plaintiffs and the Class have suffered and

27 continue to suffer irreparable injury.

28         137.    Plaintiffs and the Class are entitled to relief, including declaratory relief and injunctive

1  relief, attorneys' fees, and costs.

2         138.    Such injunctive relief may include, but is not limited to, the provision of the full range

3  of teams and participation slots in existing sports, with teams for all grade levels, including novice,

4  junior varsity, and varsity-level opportunities for female student athletes.

5  **VIII.    PRAYER FOR RELIEF**

6         WHEREFORE, Plaintiffs pray that this Court:

7         a.      Assume jurisdiction over this action;

8         b.      Certify the proposed Class;

9         c.      Enter an order declaring that Defendant has discriminated on the basis of sex against

10  female students in violation of Title IX;

11        e.      Issue a permanent injunction against Defendant (and its officers, agents, employees,

12  successors, and any other persons acting in concert with Defendant) from discriminating on the basis

13  of sex against female students;

14        f.      Issue a permanent injunction requiring Defendant to remediate its violations of Title

15  IX by, among other required actions, providing female student athletes with treatment and benefits

16  comparable to those provided to male student athletes and affording female students the equal

17  opportunity to participate in school-sponsored sports;

18        g.      Award reasonable attorneys' fees and costs incurred as a result of bringing this action,

19  pursuant to 28 U.S.C. § 2412(d) and other applicable laws; and

20        h.      Order such other and further relief as the Court deems just and proper.

21

22  Dated: February 15, 2024              By:_*/s/ Diana Hughes Leiden*_____

23                                        Diana Hughes Leiden
                                          Attorney for Plaintiffs

24
                                          Elizabeth Kristen (SBN 218227)
25                                        Nora Cassidy (SBN 321519)
                                          Sabina Crocette (SBN 197134)
26                                        **LEGAL AID AT WORK**
                                          180 Montgomery Street, Suite 600
27                                        San Francisco, CA 94104
                                          Telephone: (415) 864-8848
28

CLASS ACTION COMPLAINT                                    CASE NO. _____

1
2
ekristen@legalaidatwork.org
ncassidy@legalaidatwork.org
scrocette@legalaidatwork.org

3
4
5
6
Harriet Fischer (SBN 334198)
**CALIFORNIA WOMEN'S LAW CENTER**
360 N. Pacific Coast Highway, Suite 2070
El Segundo, CA 90245
Telephone: (323) 951-1041
harriet.fischer@cwlc.org

7
8
9
10
11
Aaron D. Kaufmann (SBN 148580)
Elizabeth Gropman (SBN 294156)
**KAUFMANN & GROPMAN LLP**
1939 Harrison Street
Suite 620
Oakland, CA 94612
Telephone: (510) 817-4380
akaufmann@kgworklaw.com
egropman@kgworklaw.com

12
13
14
15
16
Diana Hughes Leiden (SBN 267606)
Whitney Williams (SBN 335384)
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071
Telephone:       (213) 615-1700
dhleiden@winston.com
whwilliams@winston.com

17
18
19
20
21
22
Dana L. Cook-Milligan (SBN 301340)
Eric Straka (SBN 336307)
Jacqueline Ju (SBN 352204)
**WINSTON & STRAWN LLP**
101 California Street, Suite 3500
San Francisco, CA 94111
Telephone:       (415) 591-1000
dlcook@winston.com
estraka@winston.com

23
24
25
26
27
28

23